# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

JERRY BENTON,

                                                Petitioner,

        v.                                                      9:20-CV-710
                                                                (MAD/ATB)

TIMOTHY McCARTHY, Superintendent,

                                                Respondent.

JERRY BENTON, Petitioner pro se
PAUL B. LYONS, Ass't Attorney General, for Respondent

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

## ORDER and REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the

Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C.

§ 636(b) and N.D.N.Y. Local Rule 72.3(c).

Petitioner challenges a judgment of conviction, rendered after a jury trial in the

Onondaga County Court on May 21, 2015. (Petition ("Pet.") ¶ 2). Petitioner was found

guilty of Manslaughter, First Degree and Criminal Possession of a Weapon, Third

Degree. (Pet. ¶ 5). On June 19, 2015, petitioner was sentenced as a second felony

offender to a determinate term of 25 years imprisonment with 5 years post-release

supervision on the manslaughter conviction and a concurrent term of 2½ to 7 years

imprisonment on the weapons conviction. (Pet. ¶ 3).[1] Prior to his direct appeal, on June

---

[1] Respondent asserts that while petitioner's direct appeal was pending, he filed a pro se motion to vacate the judgment of conviction pursuant to New York Criminal Procedure Law § 440.10, which the trial court denied. Petitioner has not included that information in this petition, and respondent states that the instant petition does not assert any of the claims raised in the section 440.10 motion, although the papers from the section 440.10 motion have not been included in the state court record. (Resp. Mem. at 18). Rather, the petition expressly incorporates only petitioner's direct appeal and coram nobis motion. (*See, e.g.*, Pet. Ground One ¶¶ (a)-(d)).

8, 2015, petitioner made a motion to set aside the verdict pursuant to N.Y. Crim. Proc. Law § 330.30 which was denied by the trial judge.[2] (SR 158-69).  On December 21, 2018, the Appellate Division, Fourth Department affirmed petitioner's conviction, and the New York Court of Appeals denied leave to appeal on March 28, 2019.  *People v. Benton*, 167 A.D.3d 1522 (4th Dep't 2018), *lv. denied*, 33 N.Y.3d 946 (2019).

Petitioner filed a pro se coram nobis motion in the Appellate Division, asserting ineffective assistance of appellate counsel. (State Court Record ("SR") 272-96).[3]  The Appellate Division summarily denied the coram nobis application, and the New York Court of Appeals denied leave to appeal. *People v. Benton*, 173 A.D.3d 1862 (4th Dep't), *lv. denied*, 34 N.Y.3d 979 (2019).

In his federal habeas corpus application, petitioner raises the following claims:

1.    Trial counsel was ineffective.

2.    The trial court abused its discretion in failing to afford trial counsel an adjournment of the trial date.

3.    The trial court did not make an individual assessment at sentencing and the sentence was harsh and excessive.

---

[2] The People's response to petitioner's motion to vacate has been included in the state court record. (SR 170-72).  However, the trial court's decision denying the motion has not been included. The trial court's decision is not relevant to the instant petition because petitioner raised the relevant claims in subsequent proceedings, and in a federal habeas petition, this court is tasked with reviewing the decision of the last court to review the claims after exhaustion of state court remedies. 28 U.S.C. § 2254(b)(1)(A)

[3] Respondent's papers consist of the State Court Records which include the record on appeal to both the Appellate Division and the New York Court of Appeals. (Dkt. No. 16-1). The trial and sentencing transcripts have been filed separately. These consist of the pre-trial proceedings (one volume); four volumes of trial transcripts; and one volume of sentencing transcripts. (Dkt. Nos. 16-2 - 16-7).  To the extent that I cite the trial transcripts, I will refer to them by volume. ("TV1-TV4").

4.    Appellate counsel was ineffective when she failed to raise meritorious issues.

Respondent filed an answer to the petition, together with a memorandum of law and the pertinent state court records. (Dkt. Nos. 12, 13, 16). Respondent has also traditionally filed a DVD containing the video evidence shown at petitioner's trial. (Dkt. No. 18).

Petitioner has filed a traverse. (Dkt. No. 29). To his traverse, petitioner attached a document in support of his ineffective assistance of trial counsel claim that was not before the New York State courts. (Dkt. No. 29 at 50). Respondent has moved to strike this document, and petitioner has responded in opposition. (Dkt. Nos. 32, 41). For the following reasons, this court agrees with the respondent, will grant the motion to strike, and will recommend denial of the petition.

## I.    **Motion to Strike**

"'In reviewing a state court's decision on the merits under § 2254(d), federal courts are generally not permitted to expand the record beyond what was before the state court.'" *Osborne v. Graham*, No. 15-CV-6042(CJS), 2018 WL 1827673, at *7 (W.D.N.Y. Apr. 17, 2018) (quoting *Kelley v. Larkin*, 680 F. App'x 5, 7 (2d Cir. Feb. 21, 2017) (citing *Cullen v. Pinholster*, 563 U.S. 170, 181-85 (2011)). If the petitioner has failed to develop the factual basis for a claim in state court, section 2254(e)(2) provides that the court may only grant an evidentiary hearing in certain circumstances. 28 U.S.C. § 2254(e)(2)(A) & (e)(2)(B). The claim must either (1) rely on a "new rule" of constitutional law, previously unavailable, and which was made retroactive to cases on collateral review by the United States Supreme Court, or (2) the factual predicate could not have previously been discovered through the exercise of due diligence. 28

U.S.C. § 2254(e)(2)(A)(i) & (e)(2)(A)(ii).  In addition, it is required that the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable factfinder would have found the petitioner guilty of the underlying offense. 28 U.S.C. § 2254(e)(2)(B).

In this case, the document that petitioner seeks to add to the record is an email, sent on May 16, 2015, two days before petitioner's trial began. (Dkt. No. 29 at 50).  The email is from petitioner's second chair trial attorney, Uzma A. Gulamali, Esq., to his principal attorney, Robert S. Baska, Esq.  The email contains random comments regarding the location of files.  However, the document includes some questions regarding the evidence and "some thoughts" about petitioner's case. (*Id.*)  Two of the "thoughts" have been circled and involve the possible identity of the "stabber."  The first refers to the police interview of an individual, who is not mentioned elsewhere in the record and who did not testify at trial.  This individual allegedly identified another individual as the perpetrator of the crime during the police interview.  The second "thought" was a question asking "Who is Quanzo?"  Apparently "Robertson indicated he could possibly be the stabber."[4]  The email asks whether the police "followed" these "possible leads." (*Id.*)

Respondent argues that this document may not be considered in further support of the petition because it was not part of the state court record, and petitioner has failed to establish its significance. (Dkt. No. 32).  Petitioner appears to concede that the

---

[4] One of the individuals who testified for the prosecution was "Dion Robertson," who was a member of the "110" gang and who had been acquitted for the murder of a "Bricktown" member and whose brother Malik was in jail for the murder of another Bricktown member. (Robertson: TV3 at 651, 653-54, 654-56). The court can only assume that the individual named in the email is Dion Robertson.

document was not considered by any state court, but petitioner argues that he urged his "trial" attorney to present the document to the state court. Petitioner states that "it was one of the main reasons [he] filed for ineffective assistance of counsel." (Dkt. No. 41). Petitioner states that the document is relevant because the names of these other two potential perpetrators "kept coming up," but that the police never followed the leads. Finally, petitioner claims that Quanzo's name was mentioned several times by "Robertson" and "was reported and described on the 911 tape," which petitioner attempted to obtain for trial, but which was "somehow destroyed." (*Id.*)

At trial, the petitioner did not call any witnesses. He maintained that he was not the individual who stabbed the victim. He relied upon counsel's cross-examination of several individuals who identified him based on the security camera video of the incident. In his direct appeal and other state court papers, petitioner alleged ineffective assistance of both trial and appellate counsel.

In his traverse, petitioner may be attempting to supplement his claim for ineffective assistance of trial counsel. This email shows that two days before trial, Ms. Gulamali raised some issues with Mr. Baska about the identity of other potential perpetrators whose names had come up during police interviews. It does not show that Mr. Baska failed to consider those issues, nor does it show that he was unaware of "Quanzo's" identity.[5] Petitioner argues that he feels that the court should consider this

---

[5] "Quanzo" sounds similar to the first name of Daquan Sullivan whose nickname was actually "Kiss" and who was standing with petitioner outside of the store. (Davis: TV2 at 419-20; Albert: TV3 at 552-53, 556; Robertson: TV3 at 657-59). Robertson testified that he viewed Sullivan as a potential "threat." (Robertson: TV3 at 657-59). Thus, it is not unlikely that, if Quanzo was Sullivan, he might have been discussed as a potential perpetrator. However, because petitioner failed to raise this in his state court proceedings, this court can only speculate as to the relevance of the information.

document even though he did not present it in any of his state court proceedings.  If he had, these facts, if relevant, could have been developed at the state level.  Petitioner's reasoning does not justify his failure to present this document in support of his state court proceedings, and he has not established that he is entitled to an evidentiary hearing on the bases listed above.  Thus, respondent's motion to strike is granted.  In any event, even if the court were to consider this document, it would not change this court's analysis of the merits of the petition.

## II.    **Facts**[6]

The petitioner was charged in the stabbing death of Bryan Sheppard (a/k/a "Gadget"), which occurred during the early morning hours of June 7, 2014 in front of the Solvay Super Saver convenience store ("Super Saver") on Milton Avenue in the City of Syracuse.  The prosecution's theory of the case was that the petitioner and the victim belonged to two rival gangs: Bricktown (petitioner) and 110 (Sheppard), and the stabbing was retaliation for the 2012 murder of a Bricktown member (Eric Walker (a/k/a "Bell") by a member of 110 (Dion Robertson a/k/a "Lito").[7]

On June 7, 2014, Sheppard and four of his friends, Dion Robertson, Tashawn Albert (a/k/a "K.O. or Knockout"),[8] General Davis, Jr. (a/k/a "Iceberg'),[9] and a man

_____

[6] The respondent has included a very detailed statement of facts and procedural background in his memorandum of law. (Resp. Mem. at 2-18).  I will not repeat every detail, but will briefly summarize the facts, while leaving a more detailed discussion for my analysis of petitioner's claims.

[7] Robertson was tried in 2013 for the Walker murder, but was acquitted.

[8] Albert was a member of the "Lexington Avenue" or "LAMA" gang, whose members had a good relationship with the 110 gang.

[9] General Davis, Jr. was a member of LAMA.

only known as "Telace"[10] headed to the "Gravity" night club which was located next door to the Super Saver. (Davis: TV2 at 412-19, 448-49; Albert: TV3 at 549-53; Robertson: TV3 at 649, 651-53, 656, 671). Sheppard and his friends rode to Gravity in Davis's van. They parked the van in the Super Saver parking lot and walked toward the night club.

As they walked by the Super Saver, Davis and Albert saw Daquan Sullivan (a/k/a "Kiss") outside the store. (Davis: TV2 at 419-20; Albert: TV3 at 552-53, 556; Robertson: TV3 at 657-58). Sullivan was a member of Bricktown. The men also saw other Bricktown gang members–Joshua Hester and Artel Clarke–in the area. (Davis: TV2 at 421-22; Albert: TV3 at 553, 555-56; Robertson: TV3 at 666). Albert testified that he saw petitioner there as well. (Albert: TV3 at 553, 566-68, 573). Albert stated that he saw "Jerry and Kiss" in front of the store, and they later went inside the store. (Albert TV3 at 558-60). Albert also testified that he saw petitioner and Kiss (Sullivan) walking away from the store after the stabbing. (Albert TV3 at 560). Albert did not witness the stabbing itself because he was across the street speaking with his baby's mother. (Albert TV3 at 557, 560).

Lateefia Williams went to the Super Saver that night with a friend to purchase juice. She parked directly in front of the store and was talking with a friend. (Williams: TV3 at 575-79, 583-87). She testified that she saw Sullivan and petitioner, both childhood friends of hers, standing outside of the Super Saver. (Williams: TV3 at 577-79, 584-85). Sullivan came over to her car, and she spoke with him. (Williams

---

[10] Telace was apparently not affiliated with any gang.

TV3 at 578).  Williams finally got out of her car and entered the store. (Williams: TV3 at 579, 583-84).

After a few drinks in Gravity, Davis and his friends left the night club.  As they were walking toward the car, Sullivan approached them, asking Robertson if his name was "Lito." (Davis: TV2 at 422-23, 434-35, 449-50, 456; Robertson: TV3 at 657-59).  Davis told Robertson to go into the store because he was worried that Sullivan ("Kiss") had a gun.  Davis never saw a gun, but testified that he had heard a gun cocking, and the noise came from the pocket of Sullivan's hoodie.[11] (Davis: TV2 at 423).

Davis and his friends entered the store, followed by Sullivan.  Davis testified that Sheppard was already in the store purchasing a new T-shirt because he had spilled alcohol on his. (Davis TV2 at 425-26).  Davis testified that Sullivan threatened to kill Robertson in the store. (Davis: TV2 at 426).  At that time, the petitioner, who Davis referred as "Jerry from the Bricks," came into the store. (Davis: TV2 at 426-27).  Davis testified that he had known petitioner for years, and that petitioner was associated with the Bricktown gang. (Davis: TV2 at 427).  Davis identified petitioner in the courtroom as the individual who he knew as "Jerry from the Bricks." (Davis: TV2 at 427-28).

When petitioner walked into the store, Sheppard was talking to Sullivan. (Davis: TV2 at 428).  Then, Sullivan and Sheppard walked out of the store, followed by the petitioner. (*Id.*)  After the three men walked out of the store, Davis could no longer see them. (*Id.*)  Seconds later, Sheppard walked back into the store, holding his chest, and

---

[11] Sullivan had his hands in his pocket. (Robertson: TV3 at 659).  Robertson felt threatened because Sullivan was from the "Brick side," his hoodie was up, and he had his hands in his pocket. (*Id.*)

told Davis that "they snuffed" him. (Davis: TV2 at 429). When Sheppard moved his hand off of his chest, Davis could see that he had been stabbed. (*Id.*) Although Davis suggested calling 911, Sheppard refused and asked that Davis take him to the hospital personally. (*Id.*)

Davis got the van keys back from Robertson, who was still in the back of the store. Davis and Sheppard walked out of the store, but Sheppard never made it inside the van. He fell on the ground, and Davis moved the van out of the way. Davis testified that "some girl" told Davis to let her "work on him." (Davis: TV2 at 429-30). An ambulance was called, but Davis left as the ambulance was pulling up. (*Id.*) Sheppard later died. (*Id.*)

Although none of the witnesses who testified actually saw the petitioner stab the victim, security cameras from the Super Saver captured the entire incident from many angles. Video footage from several different cameras has been submitted as an exhibit to the respondent's papers and has been reviewed by the court. (Dkt. No. 18). The video footage shows three men walking out of the Super Saver,[12] and as two of the men are talking, the third man, identified by several witnesses as the petitioner, suddenly reaches over, forcefully stabs Sheppard,[13] walks away, gets into a car, and leaves the scene. (CAM3 at 40:56 to 41:25).

---

[12] The cameras were identified by number. (Dkt. No. 18: Camera ("CAM") 6 at 40:45 to 40:55; CAM15 at 40:45 to 40:53)

[13] (CAM2 at 40:48 to 41:03; CAM3 at 40:48 to 41:03; CAM6 at 40:48 to 41:03).

The videos, taken from various angles, were shown to the civilian[14] and the law enforcement witnesses, who identified the petitioner independently in the courtroom, based on seeing the video, and from still photographs.[15] (Fraher:[16] TV2 at 348; Davis: TV2 at 427-28, 430-31, 437, 439; Tashawn Albert: TV3 at 553-54, 561-62;[17] Williams: TV3 at 577-79, 581-84).

Three law enforcement officers identified the defendant.  They were not present at the crime, but identified the petitioner by watching the video and by looking at the still photographs.  Liana Snyder testified that, while she was working as a Senior United States Probation Officer in Syracuse, she supervised petitioner on probation from August 2011 to August 2012. (Snyder: TV3 at 638-40.) During that period, Snyder met face-to-face with petitioner approximately 20 times, an average of once or twice per month. (Snyder: TV3 at 640). She identified petitioner in the courtroom and from video stills. (Snyder: TV3 at 640-42; SR78-81).  Following her testimony, the court told the jurors that they were to consider Officer Snyder's testimony for identification only and not for establishing petitioner's propensity to commit a crime. (TV3 at 645).  The trial judge repeated the instruction later in the case as he was instructing the jury on the law. (TV4 at 833).

---

[14] Robertson did not identify petitioner, and did not "know" him or have any personal interactions with him, but did state that he had heard of him. (Robertson: TV3 at 665-67).

[15] Still photographs were taken from the video footage, and petitioner went to the police station after the incident and consented to be photographed. (Police Officer Michael Taylor: TV3 at 688-91, 693-94; SR at 120-27, 148-55.)

[16] Detective Matthew Fraher narrated the video.

[17] Albert also believed that petitioner was a member of the Bricktown gang, and he identified other of petitioner's associates such as Sullivan. (Albert: TV3 at 552-56, 561-62),

The court also heard testimony from Detective Timothy Galanaugh, who was a member of the Gang Violence Task Force, and who interacted on a daily basis with gang members in the City of Syracuse. (Galanaugh: TV3 at 614, 616-17). Detective Galanaugh was familiar with both the 110 and the Bricktown gangs, and had interacted with members of both gangs. (Galanaugh: TV3 at 617-18). Detective Galanaugh was involved in the investigation of Sheppard's death, and testified that he viewed the videotapes of the incident. (Galanaugh: TV3 at 620-21). He identified several of the individuals in the videos and photographs, including the petitioner. (Galanaugh: TV3 at 621-27). He specifically identified petitioner in a photograph taken from the videotape of the incident. (Galanaugh: TV3 at 627). Detective Galanaugh stated that he had seen petitioner one month prior to this crime during an incident which occurred at the Destiny U.S.A. Mall in Syracuse. (*Id.*)

Officer Jeremy Decker of the Syracuse Police Department ("SPD") testified that he was familiar with the petitioner and the Bricktown gang, having worked with the Crime Reduction Team. (Decker: TV3 at 493-94). Officer Decker testified that he had prior interactions with the petitioner. (Decker: TV3 at 494). During these previous interactions, petitioner gave his name and other identifying information to Officer Decker. (*Id.*) Officer Decker identified the petitioner in court and identified petitioner and Sullivan from a still photograph. (Decker: TV3 at 495-96). Officer Decker had stopped both individuals when they were together in a car. (Decker TV3 at 496).

Finally, Deputy Sheriff Benjamin St. Andrew testified that he supervised inmates at the Onondaga County Correctional Facility ("OCCF"). (St. Andrew: TV3 at 695-96).

11

On June 12, 2014, while petitioner was incarcerated at OCCF, he told Deputy St. Andrew that he had been jumped. When asked why he had been assaulted, petitioner volunteered that he was a member of the Bricktown gang, and he was assaulted by a member of 110. (St. Andrew: TV3 at 696-99). The court instructed the jury that this testimony was offered solely to show petitioner's identity and motive, and not his propensity to commit crime. (TV3 at 704-05, TV4 at 832-33).

## II.    Generally Applicable Law

### A.    Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

The AEDPA provides that, when a state court has adjudicated the merits of a petitioner's constitutional claim, a federal court may grant an application for a writ of habeas corpus only if "the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *See also, e.g.*, *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2001); *Brown v. Alexander*, 543 F.3d 94, 100 (2d Cir. 2008). This is a "difficult to meet," and "highly deferential standard for evaluating state-court rulings, which demands that state court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citations omitted).

"'A principle is clearly established Federal law for § 2254(d)(1) purposes only when it is embodied in a Supreme Court holding, framed at the appropriate level of generality.'" *Garlick v. Lee*, 1 F.4th 122, 128 (2d Cir. 2021) (quoting *Washington v.*

12

*Griffin*, 876 F.3d 395, 403 (2d Cir. 2017) (internal quotation marks, citation, and alteration omitted)).  A decision is contrary to well-established Supreme Court precedent "'when the state court either has arrived at a conclusion that is the opposite of the conclusion reached by the Supreme Court on a question of law or has decided a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Id.* at 128-29 (internal quotation marks omitted). "An unreasonable application of clearly established federal law occurs when 'the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case, so that the state court's ruling on the claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* at 129 (internal quotation marks, alterations, and citation omitted)).  The issue is not whether the federal habeas court "believes the state court's determination was incorrect," but whether that determination was unreasonable, which is a "substantially higher threshold." *Id.* (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

Under the AEDPA, a state court's factual findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1). If the state court failed to decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed *de novo*.  *Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).  Finally, the Supreme Court has held that circuit and district court decisions do not constitute "clearly established Federal Law, as determined by the Supreme Court." *Parker v.*

*Matthews*, 567 U.S. 37, 132 S. Ct. 2148, 2155 (2012).  Instead, circuit court decisions may illustrate the "possibility" of fairminded disagreement, sufficient to justify denying the writ. *White v. Woodall*, 572 U.S. 415, 422 n.3 (2014).

### B.    Exhaustion and Procedural Default

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, . . . thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (internal quotation and other citations omitted)); 28 U.S.C. § 2254(b)(1). The prisoner must "fairly present" his claim in each appropriate state court, including the highest court with powers of discretionary review, thereby alerting that court to the federal nature of the claim. *Id.*; *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994).

A federal judge may not issue a writ of habeas corpus if an adequate and independent state-law ground justifies the prisoner's detention, regardless of the federal claim. *See Wainwright v. Sykes*, 433 U.S. 72, 81-85 (1977).  A federal habeas court generally will not consider a federal issue if the last state court decision to address the issue "'rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Garvey v. Duncan*, 485 F.3d 709, 713 (2d Cir. 2007) (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)) (emphasis added).  This rule applies whether the independent state law ground is substantive or procedural. *Id*.

In addition, if the court finds that petitioner has failed to exhaust his claims, but he cannot return to state court, petitioner's claims are then "deemed" exhausted, but

would be barred by procedural default. *Bossett v. Walker*, 41 F.3d 825, 828-29 (2d Cir. 1994). A state prisoner who has procedurally defaulted on a federal claim in state court may only obtain federal habeas review of that claim if he can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, or if he can show that the constitutional violation has resulted in the conviction of one who is "actually innocent." *Rivas v. Fischer*, 687 F.3d 514, 540 (2d Cir. 2012); *Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) (internal quotation and citations omitted).

The actual innocence prong is referred to as the fundamental miscarriage of justice exception. *Rivas, supra*. "Cause" exists if "the prisoner can show that some objective factor external to the defense impeded counsel's effort to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Prejudice exists if there is a "reasonable probability" that the result of the proceeding would have been different absent the alleged constitutional violation. *Stickler v. Greene*, 527 U.S. 263, 289 (1999).

## III.  **Denial of Adjournment**

### A.  **Legal Standards**

"A judge's decision not to grant a continuance is a discretionary one, and does not in itself violate a defendant's constitutional rights; the Supreme Court has recognized, however, that an 'unreasoning and arbitrary' denial of a continuance may violate a defendant's due process rights to a fair trial and to present a defense or the right to assistance of counsel. *Marrant v. Cuomo*, 447 F. App'x 234, 235-36 (2d Cir. 2011) (quoting *Morris v. Slappy*, 461 U.S. 1, 11 (1983); and citing *Ungar v. Sarafite*,

376 U.S. 575, 584 (1964); *Avery v. Alabama*, 308 U.S. 444, 446 (1940). "'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.'" *Rodriguez v. Sup't of Clinton Correct. Fac.*, No. 18-CV-6202 (JGK), 2021 WL 51445, at *5 (S.D.N.Y. Jan. 6, 2021)). "'The Supreme Court has identified several factors to consider in determining whether a denial of a continuance is an abuse of discretion, including the judge's reasons for denying the continuance, the arguments made to the judge in support of the continuance, the diligence of the defendant in requesting the continuance, and the degree to which the denial of the continuance ultimately prejudiced the defendant.'" *Id.* (quoting *Marrant v. Cuomo*, 447 F. App'x 234, 235-36 (2d Cir. 2011)).

### 1.    Exhaustion/Procedural Default

Petitioner claims that the trial court erred in failing to grant him an adjournment to prepare for trial. Respondent argues that petitioner has failed to exhaust this claim, and that the claim is now barred by procedural default because petitioner has no avenue to raise the issue in state court. (Resp. Mem. at 53-55). Respondent further argues that, in any event, petitioner's claim has no merit.

This court agrees that petitioner has failed to exhaust his state court remedies with respect to his denial of adjournment claim. In his brief to the Appellate Division, petitioner argued that the trial court abused its discretion when it denied petitioner's counsel an adjournment of the trial date. (SR 204-207). The Appellate Division found,

on the merits, that the trial judge did not abuse his discretion in denying the adjournment. 167 A.D.3d 1522.  However, petitioner omitted any such argument from his application for leave to appeal to the New York Court of Appeals, focusing specifically on his claim of ineffective assistance of trial counsel. (SR 263-68).

The court notes that in the Appellate Division, petitioner argued that the denial of an adjournment contributed to trial counsel's alleged ineffectiveness because he was unable to complete his investigation of the witnesses and could not properly prepare the defense. (SR 205-207). Petitioner's trial counsel raised the issue himself in his section 330.30 motion, which was opposed by the prosecutor. (SR 162-63, 170-71). Petitioner's trial counsel raised the issue in federal terms in his section 330.30 motion before the trial court, citing inter alia *Strickland v. Washington*, 466 U.S. 668 (1984). (SR 163).  However, petitioner did not include that basis for ineffective assistance of counsel in his application for leave to appeal to the New York Court of Appeals. (SR 263-68).

It is well-settled that a petitioner's failure to include an argument in his letter requesting leave to appeal to the New York Court of Appeals, notwithstanding his submission of the entire Appellate Division brief, constitutes abandonment of the omitted issue, rendering the claim unexhausted. *Smith v. Duncan*, 411 F.3d 340, 345 (2d Cir. 2005) ("Generally 'we assume that the Court of Appeals would construe a petitioner's leave application as abandoning claims that the petitioner had pressed to the Appellate Division below' where those claims were not presented to the New York high court for review."); *Jordan v. Lefevre*, 206 F.3d 196, 198-99 (2d Cir. 2000)

(finding that appellate counsel's "arguing one claim in his letter while attaching an appellate brief without explicitly alerting the state court to each claim raised does not fairly present such claims for purposes of the exhaustion requirement underlying federal habeas jurisdiction"); *Smith v. Sup't of Elmira Correct. Fac.*, No. 17-CV-8740 (VSB/RWL), 2020 WL 5801478, at *4 (S.D.N.Y. Sept. 29, 2020); *Wynn v. Lee*, No. 11-CV-3650 (VSB/SDA), 2020 WL 2489733, at *6 (S.D.N.Y. May 13, 2020); *Swan v. Martuscello*, No. 9:16-CV-1138 (JKS), 2018 WL 6179428, at *4 (N.D.N.Y. Nov. 27, 2018).

By omitting this argument in his application for leave to appeal, petitioner has failed to exhaust his continuance claim.  Because the claim is record-based, petitioner has no recourse to raise his claim in state court. Petitioner cannot again seek leave to appeal this claim in the Court of Appeals because he has already made the one request for leave to appeal to which he is entitled. *See* N.Y. Court Rules § 500.10(a). Collateral review of this claim would be barred because the issue was previously determined on the merits on direct appeal. *See* N.Y. Crim. Proc. Law § 440.10(2)(a); *see also* N.Y. Crim. Proc. Law § 440.10(2)(c) (barring review if a claim could have been raised on direct review).  No purpose would be served by requiring petitioner to return to state court for further proceedings.

Petitioner's claim is therefore, "deemed" exhausted, but is now barred by procedural default.  He has established neither cause for the default, nor actual prejudice.  He has not asserted that he is "actually innocent" of the crime.  To the extent that he may attempt to assert ineffective assistance of counsel as "cause," the failure to

exhaust was caused by the attorney who represented him on his application for leave to appeal to the New York Court of Appeals.  However, there is no constitutional right to effective counsel in a discretionary appeal.  *See Perkins v. Capra*, No. 14-CV-5260 (ENV), 2018 WL 6624206, at *7 & n.5 (E.D.N.Y. Dec. 18, 2018) (citing *Hernandez v. Greiner*, 414 F.3d 266, 269-71 (2d Cir. 2005); *Alcindor v. Schneiderman*, No. 15-CV-1892 (AJN), 2018 WL 583117, at *3 (S.D.N.Y. Jan. 25, 2018)).  *See also Davila v. Davis*, 137 S. Ct. 2058, 2065-70 (2017) (no right to counsel in post conviction proceedings).  Thus, petitioner's claim that the trial judge abused his discretion by denying him an adjournment, either based on the conduct of the trial judge or based on petitioner's attempt at claiming that the denial of an adjournment led to ineffective assistance of trial counsel may be dismissed based on procedural default.

IV.    **Ineffective Assistance of Trial Counsel**

    A.    **Legal Standards**

The relevant federal law governing ineffective assistance of counsel claims was set forth by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984).  To succeed on a claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test set forth in *Strickland.*  First, the defendant must show that counsel's performance was deficient.  "This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth amendment." *Hudson v. New York,* No. 07-CV-1327, 2007 WL 3231970, at *2-3 (E.D.N.Y. Oct. 30, 2007) (citing *Strickland v. Washington,* 466 U.S. at 687).  Under this prong, "[j]udicial scrutiny of counsel's performance must be highly deferential . . . .

19

[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland v. Washington,* 466 U.S. at 689 (internal quotation marks and citations omitted).

Second, the defendant must satisfy the prejudice prong set forth in *Strickland* by showing that any deficiencies in counsel's performance actually prejudiced the defendant. *Id.* at 692-93. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. In making the determination whether the specific errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." *Id.* at 694.

Upon review of an habeas petition claiming ineffective assistance of counsel, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, [the district court] were adjudicating a *Strickland* claim on direct review of a criminal conviction[.]" *Paige v. Lee*, 99 F. Supp. 3d 340, 345 (E.D.N.Y. 2015) (quoting *Harrington v. Richter,* 562 U.S. 86 (2011)). Therefore, to the extent a habeas petitioner must show both that counsel's performance was

unreasonable and that the state court's decision to the contrary was unreasonable, a "doubly deferential" standard of judicial review applies to ineffective assistance of counsel claims analyzed under 28 U.S.C. § 2254(d)(1).  *Santana v. Capra*, 284 F. Supp. 3d 525, 538 (S.D.N.Y. 2018) (citing *Knowles v. Mirzayance,* 556 U.S. 111 (2009)).

### B.    Analysis

Petitioner raised his claim of ineffective assistance of trial counsel in both the Appellate Division and in the New York Court of Appeals.  After finding that the trial court did not abuse its discretion in denying petitioner an adjournment, the Appellate Division summarily ruled on the merits:  "Upon our review of the evidence, the law, and the circumstances of this case, viewed in totality and as of the time of the representation, we reject defendant's further contention that he received ineffective assistance of counsel." 165 A.D.2d at 1522.  Thus, the court will consider petitioner's ineffective assistance claim on the merits under the deferential AEDPA standard.

### 1.    Counsel's overall performance

The petition incorporates petitioner's direct appeal claim that his trial counsel was ineffective. (Pet. Ground One (citing A5-20: SR 188-203)).  In his direct appeal, petitioner raised various alleged errors by defense counsel, many of them relating to the admission of the identification testimony.  Primary trial counsel, Robert S. Baska, Esq., who was assisted by Uzma Gulamali, Esq., was petitioner's third attorney and was appointed after petitioner found fault with his prior two lawyers, the first of whom was retained counsel.  Mr, Baska assumed a very difficult case to defend because three civilians identified petitioner as being at the scene of the crime and identified him from

the videotape evidence.  In addition, three law enforcement witnesses testified that they recognized petitioner in the video and in still photographs, based on previous encounters with him.  Petitioner was offered a plea, which he turned down, and insisted on going to trial.[18]

Mr. Baska did not call any witnesses, but relied upon his cross-examination of the prosecution's witnesses, maintaining that petitioner was not the individual in the video.  He also asserted a defense based on the video, purportedly showing that the victim was not bleeding heavily when he walked back into the store after the incident.  Counsel argued that someone else must have delivered the blow that killed Sheppard, when he was "chest bumped" inside the store, long after petitioner left the scene.[19] (TV2 at 316-20 (opening statement), TV4 at 759-60, 769-91 (summation)). During his summation, counsel argued that "Jerry didn't do it," and tried to discredit the testimony regarding petitioner's gang affiliation.[20]  Counsel contended that the prosecution did not pursue a proper investigation of the crime, and that the investigation was curtailed before the real perpetrator was found. (TV4 at 760-61, 763, 766, 774).  A defense attorney is not ineffective simply because the defense was not successful, particularly

_____

[18] As respondent points out, petitioner likely went to trial because the plea offer was only for three years less incarceration than the maximum sentence. (Resp. Mem. at 21) (Pretrial Proceedings: 11/18/14 T. at 6; 4/20/15 T. at 6).

[19] As respondent points out, petitioner continued to use that line of argument in his pro se filings subsequent to his appeal. (Resp. Mem. at 21) (citing SR 172).

[20] As stated above, the prosecution's theory was that petitioner was retaliating against a member of the 110 gang because one of their other members had been acquitted in the murder of a Bricktown gang member.  The prosecution brought forth evidence of gang membership only to show motive (several instructions from the trial judge cautioned the jury to limit their consideration of gang membership).  Petitioner's counsel attempted to attack this testimony in an effort to chip away at the prosecution's case after the trial court allowed the witnesses to testify.

when the evidence against defendant was substantial. *See United States v. Kaplan*, 758 F. App'x 34, 41 (2d Cir. 2018) ("A strategy's failure to unfold as expected over the course of a trial does not mean the strategy was objectively unreasonable.") (citing *Bierenbaum v. Graham*, 607 F.3d 36, 52 (2d Cir. 2010)).  I will address petitioner's specific claims against counsel, in turn.[21]

### 2.    Failure to move to suppress or preclude identification testimony

Petitioner argues that his trial counsel should have moved to preclude both civilian and law enforcement testimony.  On appeal, petitioner claimed that (1) counsel should have moved to "preclude" the prosecution from offering witnesses identifying petitioner as the individual on the surveillance video, on grounds that the identifications were not noticed pursuant to CPL § 710.30; and (2) should have moved to suppress the identification testimony under *United States v. Wade*, 388 U.S. 218 (1967), on grounds that the testimony was tainted by unlawfully suggestive pretrial identification procedures. (Pet. Ground One; SR 188-98, 202-03).

Under New York Criminal Procedure Law § 710.30(1)(b), the prosecutor must notify the defense, within 15 days after arraignment and before trial, of the People's intent to offer testimony at trial "regarding an observation of the defendant either at the time or place of the commission of the offense or upon some other occasion relevant to

---

[21] The Appellate Division did not detail its reasons for finding that petitioner received effective assistance of counsel, and the New York Court of Appeals denied leave to appeal with no opinion. However, the court must have implicitly considered all the allegations made by the petitioner in his appellate brief.  Thus, in applying the AEDPA standard, I will also consider petitioner's specific claims and determine whether the Appellate Division's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

the case, to be given by a witness who has previously identified him as such." *People v. Pacquette*, 25 N.Y.3d 575, 578-79 (2015) (quoting CPL § 710.30(1)(b)).  If the prosecutor fails to provide the notice, then the defendant may move to preclude any such identification testimony  *Id.*

In this case, the prosecutor filed a timely section 710.30 notice, but wrote "N/A" on the form as to the People's intent to use identification testimony at trial. (SR at 11). The form states that the evidence "consists of: Line-Up, Show-Up, Photographic Array, [or] Other." (*Id.*)  The notice is dated October 9, 2014. (*Id.*) At that time, petitioner was still represented by Jeffrey DeRoberts, Esq.  On December 8, 2014, petitioner's second attorney, Theodore Stenuf, made a comprehensive pretrial omnibus motion, which included the following:

> No Notice of Intent to Use Identification Evidence has been served upon Defendant.  To permit the Prosecution to serve a proper Notice at this time and then requiring Defendant to make a further Motion to discover or preclude following such subsequent Notice would upset the orderly procedure for disposition of suppression motions.

(SR at 26-27) (citing *People v. Slater*, 53 A.D.2d 41 (4th Dep't 1976) (reversing conviction when prosecutor served 710.30 notice mid-trial).  On December 15, 2014, the prosecutor explained that no pretrial identification procedures were used or would be used as evidence.  "No identification procedure, such as a photo array, lineup, or showup was conducted in this case.  The defendant was identified from the video of the actual crime occurring." (SR at 39).  The prosecutor argued that the identification of

petitioner was confirmatory,[22] was not based upon an out-of-court identification,[23] and thus, did not require notice under section 710.30.  New York courts have supported this argument. *See Welch v. Artuz*, No. 04-CV-205(S), 2007 WL 949652, at *39 (W.D.N.Y. March 29, 2007) ("New York courts clearly have held that C.P.L. § 710.30(1)(b) does not require the prosecution to give prior notice of an in-court identification of the defendant by a witness who had not previously identified him out-of-court.") (citing inter alia *People v. Trammel*, 84 N.Y.2d 584, 588 620 (1994); *People v. Pinckney*, 27 A.D.3d 581, 582 (2d Dep't 2006); *People v. Rohan*, 214 A.D.2d 755, 755, (2d Dep't 1995)).

The trial court in this case specifically ruled, albeit related to a different issue[24] that "I will certainly allow police officers to testify that they have viewed the video in question and are able to identify the defendant as the perpetrator of the slaying." (SR at 55).  A separate motion to preclude this testimony based on lack of notice under New

_____

[22] A specific exception applies to the notice and hearing requirements of article 710 "in cases in which the defendant's identity is not in issue, or those in which the protagonists are known to one another . . . ." *People v. Rodriguez*, 79 N.Y.2d 445, 449 (1992) (quoting *People v. Gissendanner*, (48 N.Y.2d 543, 552 (1979) (alteration in original).  "'[S]uggestiveness' is not a concern and, hence, [CPL 710.30] does not come into play.'" *Id.*  The court notes that this exception applies even if a suggestive pretrial procedure occurred.

[23] The record reflects that two of the six identification witnesses saw the surveillance tape prior to trial. (Davis: TV2 at 447 (civilian); Galanaugh: TV3 at 620-21 (law enforcement)).  In any event, it is clear from the testimony that the witnesses knew the petitioner prior to the incident, and even if the viewing of the crime video had been in any way suggestive, the court would not have likely suppressed the evidence.  Finally, even if two of the witnesses's identifications had been suppressed, there would have been four other identifications, and any failure by the defense counsel in this regard would not have prejudiced the defendant.

[24] This ruling was made in conjunction with the prosecutor's request to present testimony from law enforcement officials which would associate petitioner with gang membership. (SR at 48-52). Defense counsel opposed the presentation of such testimony. (SR at 53).

York law would not have been successful.

In addition, with respect to the civilian testimony, generally, the "reliability of eyewitness identification testimony is usually an issue for jury determination," and such evidence is only excluded to preserve a defendant's due process rights when "the degree of unreliability leads to 'a very substantial likelihood of irreparable misidentification.'" *Kennaugh v. Miller*, 289 F.3d 36, 43 (2d Cir. 2002) (quoting Manson v. Brathwaite, 432 U.S. 98, 116 (1977)). A defendant may challenge the admission of identification testimony prior to trial. *United States v. Wade*, 388 U.S. 218 (1967). The purpose of a *Wade* hearing is to determine whether identification testimony has been tainted by official suggestion during police-arranged pretrial identification procedures. *Id.*

In this case, each of the witnesses who identified the petitioner at trial knew the petitioner personally.[25] The issue was whether the individual in the video was the

---

[25] Lateefia Williams, who was not a gang member, testified that petitioner was a "childhood friend" who she had known for years. (Williams: TV3 at 577-79). Although she had not seen him for months prior to the stabbing, she stated that she had seen him at a cookout and "otherwise" around the small neighborhood. (Williams: TV3 at 586-87). She testified that, on the night of the crime, she saw petitioner and Daquan Sullivan standing in front of the store. (Williams: TV3 at 577-79, 584). She identified petitioner in the courtroom and identified petitioner and Sullivan from the video and video stills. (Williams: TV3 at 581-84). General Davis also testified that he had known petitioner for years and knew that he was a member of the Bricktown gang. (Davis: TV2 at 427, 453-54). Davis had seen petitioner a week before the stabbing and also identified him in the courtroom, in the video, and from the still photographs. (Davis: TV2 at 427-28, 430-31, 437). Tashawn Albert testified that he had known petitioner for years "'from the streets.'" (Albert: TV3 at 553, 568-69). These individuals clearly knew the petitioner, and any identification of petitioner at trial was confirmatory even if the police had conducted a pretrial identification. As for the law enforcement witnesses, Lyana Snyder testified that she had supervised the petitioner on probation for approximately one year from 2011 until 2012. (Snyder: TV3 at 639-40). During that time, she met face-to-face with petitioner approximately 20 times. (Snyder TV3 at 640). She identified petitioner in the courtroom and from still photographs. (Snyder: TV3 at 640-41). Officer Decker testified that he had previous "interactions" with petitioner "on more than one occasion," and that on these occasions, petitioner had provided his name. (Decker: TV3 at 494). Officer Decker identified petitioner in the courtroom and from video stills. (Decker: TV3

petitioner, and each of the witnesses who identified petitioner confirmed that he was the individual in the videotape and in the still photographs taken from the videotape. Petitioner has not cited to any allegedly "suggestive" pretrial identification procedure, and there are none in the record.  Thus, a suppression motion would not likely have succeeded, and counsel was not ineffective for failing to make a futile motion. *United States. v. Goodwin*, 224 F. App'x 114, 115 (2d Cir. 2007) (quoting *United States v. Tisdale*, 195 F.3d 70, 73-74 (2d Cir. 1999)).[26]

On appeal, petitioner also asserted that trial counsel should have argued that the law enforcement officers' identification of petitioner should be precluded as improper "lay opinions." (SR at 191-92).  "A lay witness may give an opinion concerning the identity of a person depicted in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *People v. Russell*, 165 A.D.2d 327, 333 (2d Dep't 1991), *aff'd*, 79 N.Y.2d 1024 (1992).  The court determines whether "given the personal knowledge these witnesses had of defendant's appearance as of the time when the

---

at 494-96).  Detective Galanaugh testified that he did view the video prior to his testimony and stated, inter alia, that he saw or observed petitioner 20 to 30 times, including when petitioner himself had been the victim of a violent crime that Detective Galanaugh was investigating. (Galanaugh: TV3 at 623-26, 629, 631, 633).  Detective Galanaugh identified petitioner in the courtroom and from video stills. (Galanaugh: TV3 at 625-27).  Clearly, these identifications were based upon the witnesses' independent familiarity with petitioner.

[26] As respondent notes, petitioner argued on appeal that, under New York law, a *Wade* hearing must be granted, if requested, to determine whether the identifications are "confirmatory." (Resp. Mem. at 28) (citing *People v. Rodriguez*, 79 N.Y.2d 445, 450-51 (1992)).  This situation exists where suggestive pretrial procedures occurred.  As stated herein, petitioner has failed to argue, and the record does not show that any suggestive pretrial procedures occurred.  Thus, counsel would not have acted unreasonably in failing to insist upon such a hearing.

photographs were taken, their testimony served to aid the jury in making an

independent assessment regarding whether the man in the [surveillance] photographs

was indeed the defendant . . . ." *People v. Russell*, 79 N.Y.2d at 1025.

On direct appeal, petitioner's counsel argued that the law enforcement witnesses

could testify as to petitioner's identity only if his appearance had changed after the

incident. (SR at 191).  However, New York law does not support such a narrow

application. *See, e.g., People v. Pinkston*, 169 A.D.3d 520, 521 (1st Dep't 2019) (even

though defendant had not changed appearance, identification from video was admitted

because of "the poor quality of the surveillance tapes, which showed groups of young

men, mostly from a distance").  In addition, New York courts have admitted this type of

testimony as long as the official had sufficient interactions with the defendant prior to

the video identification. *People v. Gordon*, 197 A.D.3d 723, 150 N.Y.S.3d 591, 592 (2d

Dep't 2021) (Mem) ("[T]he County Court properly permitted two police witnesses to

testify that the defendant was the person depicted in a surveillance video taken by the

strip club's security camera based upon the witnesses' own personal knowledge of the

defendant. The testimony 'served to aid the jury in making an independent assessment

regarding whether the man in the [footage] was indeed the defendant'") (citing inter

alia *People v. Franzese*, 154 A.D.3d 706, 707 (2d Dep't 2017) (court allowed testimony

by officer who knew the defendant from her patrols and from her many interactions

with him)).  As stated above, in this case, at least two of the law enforcement officers

witnesses had substantial interactions with the petitioner, and trial counsel did not act

unreasonably when he failed to object to their testimony on this basis.[27]

### 3.    Failure to Object to the Alleged *Molineux* Violation

Petitioner also argues that counsel improperly failed to object when the prosecutor violated the court's *Molineux*[28] ruling during the trial.  Prior to trial, the prosecutor moved to admit evidence of petitioner's gang affiliation in order to show identity and motive. (SR at 48-52).  The prosecutor also sought to establish gang membership through the testimony of a jail officer, to whom petitioner admitted being part of the Bricktown gang. (SR at 52).

Oral argument was held on May 4, 2015 (Hearing Transcript 5/4/15 at 1-11) (Dkt. No. 16-2).  Defense counsel argued that this testimony would be more prejudicial

---

[27] As respondent notes, Officer Decker was the only "outlier," who had come into contact with petitioner on only one or two occasions in the context of traffic stops prior to his identification of petitioner from the video stills. (Resp. Mem. at 37; Decker: TV3 at 495 "more than one occasion"). Defense counsel attempted to discredit Officer Decker's identification on cross-examination by emphasizing that the officer had only seen petitioner twice, and the last time he allegedly saw petitioner was a "year and a half prior to this event." (Decker: TV3 at 497-98).  In addition, the trial judge instructed the jury on the evaluation of identification testimony, including looking to "how many times" the witness saw the defendant. (TV4 at 819, 823, 825, 834-37). Finally, the jurors were able to see the same still photos seen by Officer Decker and make up their own minds about whether the individual was the same person who committed the stabbing.  The court also explained to the jury that law enforcement testimony was not given any special credence. (TV4 at 830).  However, even if petitioner's counsel had successfully moved to preclude Officer Decker's testimony, it is clear that the other identification testimony was overwhelming, and any error by counsel in this regard would not have changed the outcome, and therefore, petitioner would not be able to establish prejudice.

[28] *People v. Molineux*, 168 N.Y. 264 (1901). The prosecution may move to offer evidence of other, uncharged crimes if "'it is relevant to some material issue in the case and the trial court determines in its discretion that the probative value of the evidence outweighs the risk of undue prejudice to the defendant.'" *Yusuf v. Colvin*, No. 18-CV-3360 (MKB), 2022 WL 4291784, at *13 & n.11 (E.D.N.Y. Sept. 16, 2022) (quoting *People v. Frumusa*, 29 N.Y.3d 364, 369 (2017)). "Before introducing this evidence at trial, 'the prosecutor should ask for a ruling out of the presence of the jury at which the evidence to be produced can be detailed to the court,' after which the court must 'either admit or exclude it in total, or admit it without the prejudicial parts when that can be done without distortion of its meaning.'" *Id.* (quoting *People v. Ventimiglia*, 52 N.Y.2d 350, 362 (1981)).

than probative, and the court ultimately ruled that the prosecution would be able to introduce "competent evidence regarding the defendant's affiliation with the 'Bricktown' gang." (*Id.*) (*See* SR at 54-55) (court's written decision).  The prosecutor was not permitted to call individuals who would testify that petitioner was a member of Bricktown solely based upon a RICO investigation identifying the petitioner as such. (SR at 55).  The court also allowed the testimony of the Onondaga County Justice Center deputy to whom the petitioner admitted being a member of Bricktown. (*Id.*)

Although the court allowed the law enforcement testimony discussed above, the court did not believe that it was appropriate for the officers to describe "their underlying reasons for their interactions" with petitioner, their "opinions" that he was stopped with other gang members, or that the interactions occurred in "Bricktown territory." (*Id.*)  It would be sufficient for the officer to testify that he or she had previous interactions with the petitioner, before offering an opinion that he was the person in the video committing the stabbing. (*Id.*)

The court, however, expressly permitted Officer Decker to testify that he had encountered petitioner with Daquan Sullivan on December 31, 2012. (SR at 55 n.2.) The federal probation officer was limited to testifying that she had interactions with petitioner, but was not allowed to mention the specific nature of the crime for which petitioner was being supervised. (SR at 55-56).  The court proposed limiting instructions on the testimony. (*Id.*)  On the first day of trial, the prosecutor asked for a clarification of the court's ruling. (TV1 at 7-10).  The court precluded "any police testimony that indicates that Mr. Benton is a member of any gang," but held that an

officer's knowledge of gang territory and rivalries was "relevant background testimony to complete this narrative."[29] (TV1 at10).

On appeal, petitioner claimed that the civilian eyewitnesses lacked personal knowledge to support their testimony that petitioner was a gang member; and (2) police witnesses improperly testified that petitioner and other individuals at the scene of the crime were gang members. (SR at 193-97).  Counsel was aware of the court's previous ruling, the lay witnesses testified regarding their own gang membership, and had personal knowledge of the petitioner's membership in the gang.  As argued by the prosecution on appeal, counsel may have refrained from objecting to the testimony, knowing that an objection would be overruled, and that a futile objection would have only served to highlight the witnesses testimony. (SR at 233).

Instead, defense counsel used the judge's ruling to his advantage during summation, emphasizing that the law enforcement witnesses never "actually said" that petitioner was in a gang.[30] (TV4 at 766).  In fact, counsel's summation further argued that "nobody said, Jerry is in a gang." (TV4 at 760).  Counsel focused his summation on perceived inadequacies in the police investigation, including questioning why the

---

[29] Petitioner complained on appeal that Detective Galanaugh was allowed to expound on individuals' gang membership and refer to unrelated gang investigations. (SR 194, 200-201).  As respondent points out, the trial court prohibited only discussion of petitioner's gang membership "without" personal knowledge, but did not prohibit discussion of the gang membership of other individuals.  Detective Galanaugh's personal knowledge was established (TV3 at 620-25), so the court did allow evidence of gang membership for purposes of identity and motive.  Finally, counsel did object on the record to the testimony, the court heard argument on the matter, but counsel's objections were overruled, both before and after law enforcement witnesses' testimony. (TV3 at 474-75, 634-36).  Any further objections would have been futile.

[30] The law enforcement officers were not allowed to do so because of the judge's *Molineux* ruling.

"other" witnesses who were present during the crime did not testify. These trial tactics were all in an effort to support the petitioner's argument that the prosecution had not met its burden to prove guilt beyond a reasonable doubt. (TV4 at 760-66).

Counsel attempted to discredit the law enforcement witnesses' identification of the petitioner, arguing for example that Officer Decker only saw him during a traffic stop "eighteen months ago."[31] (TV4 at 766). Counsel then attempted to discredit the lay witnesses' testimony, including General Davis, who was hoping to shorten his impending federal sentence by testifying in favor of the prosecution. (TV4 at 766-68). Counsel highlighted every possible inconsistency in Davis's testimony. (*Id.*) Counsel attempted to discredit the *inmate* lay witnesses' testimony by implying that they were all in jail together, had breakfast together before coming to testify, "and still couldn't get their stories straight." (TV4 at 769-70). Under these circumstances, counsel's failure to object to a perceived violation of the judge's *Molineux* ruling was not unreasonable.

Counsel did an admirable job with overwhelming evidence against his client. Thus, in finding that the petitioner was not denied effective assistance of counsel, the Appellate Division did not make a determination that was contrary to *Strickland*.[32]

---

[31] In summation, petitioner's counsel discussed the fault in each of the witnesses' testimonies. (*See e.g.* TV4 at 767-71).

[32] In one sentence contained in the petitioner's Appellate Division brief, he argued that "alternatively," the court should examine the violation of *Molineux* for purposes of finding prosecutorial misconduct. (SR at 203). Petitioner did not raise this claim specifically in his petition, but had incorporated his appellate claims. Respondent argues that, if the court should liberally construe the petition as raising a prosecutorial misconduct claim, it should be dismissed because it is both unexhausted, and the Appellate Division declined to consider it "as a matter of discretion in the interests of justice," rendering it procedurally defaulted. 167 A.D.2d at 1522. In his traverse, petitioner

## V.    Ineffective Assistance of Appellate Counsel

### 1.    Legal Standards

The general standard for ineffective assistance of counsel, articulated by the Supreme Court in *Strickland v. Washington*, applies to both trial and appellate counsel. *McKee v. United States*, 167 F.3d 103, 106 (2d Cir.1999) (*Strickland* standard also applies to effectiveness of appellate counsel). While a defendant has the right to effective counsel on appeal, *Evitts v. Lucey*, 469 U.S. 387, 396-397 (1985), in the appellate context, counsel is not required to advance every non-frivolous argument that could be made. *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001) (citing *Evitts*, 469 U.S. at 394. *See also Jones v. Barnes*, 463 U.S. 745, 75 (1983)). "However, a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) (citing *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994)).

### B.    Analysis

Petitioner's appellate counsel also performed admirably. In fact, as respondent points out, the petitioner has incorporated his appellate brief into this petition for habeas corpus. Clearly, petitioner believes that the claims that his attorney raised on

---

now claims that he is raising a prosecutorial misconduct claim and that the court should consider it. (Dkt. No. 29 at 11-14). Although petitioner cites the AEDPA standard in his analysis, he forgets that he must properly raise the claim in New York State courts prior to the court being able to evaluate the claim under the AEDPA. After the one sentence in his appellate brief, petitioner did not include any prosecutorial misconduct claim in his application for leave to appeal to the New York Court of Appeals, (SR at 264-68). The claim is both unexhausted and procedurally defaulted. Petitioner has shown neither cause nor prejudice for the default. Thus, even if the court had construed plaintiff's single reference as an alternative claim for prosecutorial misconduct, it would have to be dismissed.

appeal have some merit because he is still relying upon them.  A review of petitioner's brief on appeal confirms this finding.  Counsel made extensive arguments regarding trial counsel's alleged ineffectiveness and filed a reply brief making further arguments after the People filed their response. (SR at 241-55).  In his application for review by the New York Court of Appeals, petitioner's new attorney incorporated many of the same arguments made by petitioner's Appellate Division attorney. (SR at 264-68).

In his coram nobis application, challenging the effectiveness of appellate counsel, petitioner proposed two related arguments that he believed appellate counsel should have made: (1) trial counsel's opening statement improperly shifted the burden of proof to petitioner by promising to show the jury video evidence that someone other than petitioner stabbed the victim; and (2) counsel failed to provide such evidence. (Pet. Ground Four, SR at 275, 277-80, 284).

During his opening, counsel stated that the petitioner was not likely the individual who dealt the mortal blow to the victim, "and we will show that to you." (TV2 at 316).  Essentially, part of the defense was that the victim was struck in the store, after petitioner left the scene and that the individual who the jury saw in the video was not the petitioner.  However, defense counsel does not shift the burden of proof by stating that the evidence will show the defendant's innocence.  The court repeatedly instructed the jury, in its initial charge and its final instructions, that the defense had no burden, that the burden lay solely with the prosecution, and that the burden "never shifts from the People to the defendant." (TV2 at 294-95, 297-98, TV4 at 822-24, 834).

Counsel did not "break his promise" to the jury.[33]  Counsel never "promised" to call witnesses to testify to a second attack.  Appellate counsel's failure to raise this meritless claim was not unreasonable.  In any event, even if the claim had some merit, petitioner has not shown that the other issues raised by appellate counsel were "clearly and significantly weaker."

Petitioner argued in his coram nobis application that appellate counsel should have raised arguments asserting trial counsel's failure to properly investigate the "second attack" and  "improper influences" on the jury. (SR at 280-82).  As respondent argues, the trial counsel's alleged "failure to investigate" an alleged second attack is a matter outside the appellate record which would not have been a proper subject for the petitioner's direct appeal.[34]  Petitioner has also failed to assert what a further investigation would have produced or how that would have changed the outcome of the case. *See Wood v. Artus*, No. 15-CV-4602 (SJF), 2020 WL 3256848, at *9 (E.D.N.Y. June 15, 2020) ("[a] petitioner alleging that counsel's ineffectiveness was centered on a

---

[33] In counsel's cross-examination of Detective Fraher, who narrated the video, he attempted to elicit an admission from the detective that, prior to the victim being "chest bumped" inside the store, the victim's T-shirt showed little signs of blood, whereas after the "chest-bump," the T-shirt appeared to be saturated with blood. (Fraher: TV2 at 389-96).  Later, during his summation, counsel discussed parts of the video that purportedly depicted the "second attack" on the victim. (TV4 at 775-88).

[34] *See e.g. People v. Taylor*, __ N.Y.S.3d __, 2022 WL 4230526 (Mem) (2d Dep't Sept. 14, 2022) ("Since the defendant's claim of ineffective assistance of counsel cannot be fully resolved without reference to matter outside the record, a CPL 440.10 proceeding is the appropriate forum for reviewing the claim in its entirety, and we decline to review the claim on this direct appeal.") (citing *People v. Freeman*, 93 A.D.3d 805, 806 (2d Dep't 2012); *People v. Maxwell*, 89 A.D.3d 1108, 1109 2d Dep't 2011)).  In this case, petitioner's only record-based argument supporting this aspect of the alleged ineffective assistance of trial counsel claim is the claim that defense counsel somehow failed to "utilize the prosecution witness to narrate the events of the second attack."  That argument is belied by the transcript showing that counsel cross-examined Detective Fraher about the alleged second attack. (Fraher: TV2 at 389-96).

supposed failure to investigate has the burden of providing the court sufficiently precise information, that is, a comprehensive showing as to what the investigation would have produced.") (quoting *Halo v. United States*, No. 06-CV-5041, 2007 WL 1299158, at *13 (E.D.N.Y. Apr. 30, 2007)). Thus, petitioner's appellate counsel could not have acted unreasonably in failing to raise the issue.

Finally, petitioner claims that appellate counsel should have raised the issue of jury contamination. There were three incidents in which potential outside influences could have affected the jurors. The first incident occurred when the video of the stabbing was shown in court. Certain spectators, apparently affiliated with the victim, engaged in a loud commotion and screaming in the gallery, disrupting the proceedings. (TV2 at 353-55). The trial judge immediately ordered all the spectators to leave the courtroom and ordered petitioner to be removed as well. Petitioner was removed through a side door. (*Id.*) The trial judge ordered a recess. (TV2 at 354). Once outside the jury's presence, the court described the incident for the record, noting that the spectators and petitioner had been removed. Counsel moved for a mistrial, arguing that the jury had been contaminated by the "cries of anguish" from spectators who were sitting on "the prosecution side," and that no jury instruction could cure that contamination. (TV2 at 356-62). Counsel also argued that it would have been "clear" to the jury that petitioner was in custody, given that deputies had hurried him out a side door. (TV2 at 358).

The trial judge denied the motion and instructed the jury that the outburst was not relevant to the proceeding at all and should not reflect negatively upon the petitioner.

(TV2 at 364).  The judge then asked each of the jurors individually whether he or she could set aside the incident, determine the case based on the evidence, and not hold the outburst against the petitioner in any way.[35] (TV2 at 364-65).  Each of the jurors confirmed that he or she could still be objective and give the petitioner a fair trial. (TV2 at 366).  "[T]he decision to declare a mistrial rests within the sound discretion of the trial court, which is in the best position to determine if this drastic remedy is truly necessary to protect the defendant's right to a fair trial." *People v. Duell*, 124 A.D.3d 1225, 1228 (4th Dep't 2015) (citation and internal quotation marks omitted) (affirming denial of mistrial in connection with spectator misconduct).  Thus, petitioner cannot show that appellate counsel's failure to raise this claim on appeal ignored a "significant and obvious issue."

The second incident was raised at trial by defense counsel himself.  He claimed to have overheard petitioner's original attorney speaking loudly in the hallway about the case outside the jurors' entrance. (TV3 at 472-73).  The court asked the jurors whether they had overheard any discussions in the elevator, on the steps, or any time coming into the jury deliberation room. (TV3 at 482).  The jurors responded in the negative.[36] (*Id.*)

---

[35] In fact, the court was extremely careful to limit any distractions to the jurors.  After the outburst, and after various other more minor distractions, the court limited the spectators ability to move in and out of the courtroom. (*See e.g.* TV3 at 480).  The judge limited the use of cell phones by spectators in the courtroom, and prohibited entry or exit during a witness's testimony, unless an emergency arose so as to minimized any distraction to the jury. (TV3 at 480-81).

[36] At the same time, the court also discussed the substitution of a law enforcement witness with the witness's partner, who was not on the prosecution's list of witnesses. (TV3 at 483).  Petitioner's counsel earlier objected to the testimony of either officer if their testimony was going to focus on petitioner's alleged gang affiliation and the "feud" between gang members. (TV3 at 473-78).  Later,

In the third incident, as they were leaving the courthouse, some jurors overheard a conversation[37] between spectators who were apparently acquainted with the petitioner. The court brought each juror into chambers individually and asked whether he or she overheard the conversation, and if so, whether it affected their ability to judge the case. (TV3 at 513-43). Most of the jurors did not hear anything, and the jurors who did, all assured the trial judge that the conversation did not affect their ability to be impartial. (*See e.g.* TV3 at 522-26, 529, 533, 537, 542-43). At the end of the judge's interviews, neither the prosecutor, nor defense counsel had any problem with the situation, and the court stated on the record that this issue was resolved "to [his] satisfaction." (TV3 at 543). Given the facts developed by the court, appellate counsel had no basis to raise any claims regarding the jury or the effect of any outside influences on the jury's impartiality. The Appellate Division did not act contrary to *Strickland* in denying the petitioner's application for a writ of coram nobis raising the ineffective assistance of appellate counsel. Thus, petitioner's claim of ineffective assistance of appellate counsel may be dismissed.

## VI.    Sentencing

### A.    Legal Standards

An excessive sentence claim may not be raised as grounds for habeas corpus relief if the sentence is within the range prescribed by state law. *White v. Keane*, 969

---

petitioner's trial counsel moved again for a mistrial, arguing that he was not given important impeachment material for one of the law enforcement witnesses who had already testified. (TV3 at 502-504). The motion was fully argued, but the court denied it on the record. (TV3 at 508-509).

[37] The judge was not aware of it when he discussed whether the jurors overheard petitioner's former attorney discuss the case in the hallway. (TV3 at 513).

F.2d 1381, 1383 (2d Cir. 1992); *Hernandez v. Superintendent*, No. 17 Civ. 2457, 2018 WL 502784, at *5 (S.D.N.Y. Jan. 22, 2018) (citing inter alia *Vassar v. Artus*, No. 08-CV-0041, 2016 WL 3632712 at *7 (N.D.N.Y. June 29, 2016) ("It is well settled that an excessive sentence claim may not be raised as grounds for federal habeas corpus relief if the sentence imposed was within the range prescribed by state law."); *Quintana v. Lee*, No. 12 Civ. 3204, 2016 WL 2755918 at *5 (S.D.N.Y. May 11, 2016)).  A petitioner's claim that the sentencing judge abused his discretion in his or her sentencing decision is generally not a federal claim that is subject to review by habeas corpus.  *Fielding v. LeFevre*, 548 F.2d 1102, 1109 (2d Cir. 1977) (finding no cognizable federal claim when petitioner alleged that the state judge abused his sentencing discretion).  In order to raise a constitutional claim, a petitioner must show that the trial court's sentencing decision amounted to an improper "arbitrary or capricious abuse of discretion" that deprived the petitioner of his liberty.  *Herrera v. Artuz*, 171 F. Supp. 2d 146, 151 (S.D.N.Y. 2001).

The Eighth Amendment forbids extreme sentences which are "grossly disproportionate" to the crime of conviction. *See Lockyer v. Andrade*, 538 U.S. 63, 72-73 (2003); *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (citations omitted).  The gross disproportionality principle is applicable only in "exceedingly rare" and "extreme" cases. *Id.* at 73, 77 (citing *Harmelin*, 501 U.S. at 1001).

**B.    Analysis**

Petitioner's argument on appeal was that the court should reduce the petitioner's sentence "in the interests of justice" because the sentencing court did not make an

individualized assessment. (SR 208-210).  Petitioner was convicted of First Degree

Manslaughter. N.Y. Penal Law § 125.20(1). The authorized sentence for this crime is a

determinate term of a minimum of 8 years to a maximum of 25 years, along with

post-release supervision of 5 years. *See* N.Y. Penal Law §§ 70.06(6)(a), 70.45(2).

Petitioner was sentenced to the statutory maximum term for manslaughter, together

with a concurrent sentence for the weapons possession charge.  The sentence for

manslaughter, although the maximum, was clearly within the range prescribed by law.

This is not one of those rare circumstances in which the sentence was

"disproportionate" to the crime.  Thus, petitioner's sentencing claim is not cognizable

and must be dismissed. *White, supra.*

        **WHEREFORE**, based on the findings above, it is

        **ORDERED**, that respondent's motion to strike (Dkt. No. 32) is **GRANTED**, and

it is

        **RECOMMENDED**, that the petition be **DENIED and DISMISSED**, and it is

        **RECOMMENDED**, that a certificate of appealability be **DENIED**.

        Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have

fourteen (14) days within which to file written objections to the foregoing report.

These objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT</u>**

**<u>TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE</u>**

**<u>APPELLATE REVIEW.</u>** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing

*Small v. Secretary of HHS*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R.

Civ. P. 72.

Dated: September 23, 2022

Andrew T. Baxter
U.S. Magistrate Judge

40